IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA, )
)
        Plaintiff, )
)
v. )   Case No. 10-20004-JWL
)
BRUCE M. JONES II, )
)
)
        Defendant. )

## MEMORANDUM AND ORDER

This case comes before the court on defendant's motion to suppress (Doc. 12). The court has considered the parties' written submissions and the testimony and argument presented at an evidentiary hearing on May 17, 2010. For the reasons described herein, the motion is denied.

## FINDINGS OF FACT

On Dec. 15, 2009, Sergeant Troy Blunt of the Missouri Highway Patrol was staking out Grow Your Own Hydroponics, a business in Kansas City, Missouri that sold supplies and equipment for use in hydroponic gardening.[1] Blunt was assigned to the agency's narcotics unit, and his interest in the store's clientele stemmed from his

---

[1] According to the Government's Exhibit 1, a printout of pages from the Grow Your Own Hydroponics website, hydroponic gardening is the practice of growing

knowledge that people often use hydroponic systems to illegally grow marijuana. Blunt was wearing street clothes, was unarmed, and was driving an unmarked pickup truck. Two other uniformed state troopers who were taking part in the detail, Corporal Andrew Bell and Trooper Evan Tyrrell, were several blocks from the store in marked Missouri Highway Patrol vehicles. The troopers' regular practice on such a stakeout was to observe shoppers coming and going, run the license-plate numbers of some customers' vehicles, and occasionally to follow vehicles for further investigation.

Sergeant Blunt saw Defendant arrive at the business in a red four-wheel-drive truck, enter the store and come out carrying a plastic sack. While Defendant was in the store, Blunt noted the vehicle's license plate number and relayed the number to Corporal Bell, who contacted Blunt's secretary in Jefferson City and began gathering information about the vehicle and registered owner. The troopers learned that the vehicle was registered to Defendant at a Kansas City, Missouri address and that Defendant's driving privileges were suspended in Missouri.

Blunt decided to follow Defendant from the store. The two uniformed troopers, Bell and Tyrrell, followed the same course but stayed several blocks to a mile behind Blunt and Defendant. During the drive, which lasted roughly 30 minutes and wound through residential streets, the troopers learned that Defendant had a prior

---

plants without soil by sending nutrients directly to their root systems.

drug conviction in Missouri.

Defendant eventually crossed the state line into Kansas City, Kansas, although Sergeant Blunt testified that he did not know he had crossed the state line and believed he was still in Kansas City, Missouri. Defendant turned down an alley, drove a short distance and stopped his vehicle in front of a shed, which stood in a grassy area adjacent to the alleyway. The shed stood roughly 30 feet from the back door of a home, separated from the home by a grassy embankment and a concrete patio that extended from the rear of the home. The entire area was unfenced, and, based on Blunt's testimony and the photographs contained in the Government's exhibits, the line of demarcation between the alley and the back yard of the home is unclear.

Sergeant Blunt drove past the alley where Blunt had turned and momentarily lost sight of him. Blunt then stopped and waited, in the area just past the alley entrance, for the two uniformed troopers to arrive. When they arrived, all three vehicles entered the alley and Blunt pulled in behind Defendant's truck, leaving his vehicle anywhere from 3 to 10 feet behind Defendant's, with the two marked patrol cars behind him. Sergeant Blunt walked up to the driver's side of Defendant's truck as defendant was getting out of the truck, leaned against the bed of the truck, identified himself, and stated that he was conducting a drug investigation and was

there to get Defendant's marijuana plants.[2]

Sergeant Blunt testified that Defendant's response to this introduction was to drop his head and say, "Oh, shit." Blunt testified that when Defendant asked how Blunt knew that he had marijuana plants, Blunt answered, "Because you said, 'Oh, shit.'" Blunt testified that the two men laughed, that his own demeanor during this conversation was casual and that Defendant's demeanor was "that of a man who is surrendering... like, 'You got me.'" The two uniformed troopers, Bell and Tyrrell, stood several feet behind Sergeant Blunt during this initial conversation, according to Blunt's testimony.

Sergeant Blunt testified that after this exchange, within 30 seconds of initiating conversation with Defendant, he asked for Defendant's identification. Defendant provided a means of identification, which Trooper Bell took to his patrol car to run a check through state records. Sergeant Blunt testified that, as they conversed, Defendant began trying to deflect attention from their present location by stating that the marijuana plants were at another address, but Blunt told Defendant that before leaving, he wanted to clear up whether there were any marijuana plants at his house.[3] Blunt testified that Defendant never stated that he did not want the

---

[2] Sergeant Blunt testified that he told Defendant, "I'm here for your marijuana plants," or "I'm here to get your marijuana plants."
[3] Blunt testified that in response to Defendant's claim that the marijuana plants were elsewhere, he stated, "That's fine, you know, but let's clear up what we have here today" and that he told Defendant he wanted to "make sure there's none here at your

officers entering the home or that he would refuse them permission to enter, but rather that he eventually started walking toward the back door of his house, with Blunt and Trooper Tyrrell behind him.

Sergeant Blunt testified that when he got about 10 feet from the back door of the residence, while following Defendant, he smelled a strong odor of marijuana coming from the home. Defendant walked through the rear door of the home and into an enclosed back porch. As Blunt followed Defendant, Blunt noticed a large, new padlock on a cellar door inside the back porch.[4] Defendant took out his keys, opened the door leading from the porch into the home, entered, and went through a kitchen to a middle room, where he turned and faced Blunt and Tyrrell and raised his hands with palms up as if to signal that there was nothing for the officers to see. Blunt testified that he then told Defendant that he could smell the plants, and that Defendant dropped his head again.

Defendant then walked to a closed door nearby and used his keys to open the door. Blunt testified that he believed Defendant was going to show the troopers the location of his plants but that instead, Defendant reached through the door, took out a

---

house." As they continued talking, Blunt testified, "I just casually brought it back around to the point of 'We need to deal with you and your residence today, and let's get you cleared up here and make sure you're okay and then we will talk about the other one." Blunt testified that, even though he made clear to Defendant that he wanted to determine whether there was any marijuana on the premises, he never explicitly asked "May I search your house?"

[4]Blunt testified that based on his experience, most indoor marijuana-growing

long gun, and aimed it at Blunt's midsection. Blunt testified that he began shouting "Gun!" and that he backed up and stumbled to the ground. Blunt testified that Tyrrell, who also had fallen to the ground, fired five or six shots in Defendant's direction and that he and Tyrrell then retreated from the home.

Defendant, who was struck and injured by Tyrrell's gunfire, eventually surrendered at the home and was taken into custody by the Kansas City, Kan. Police Department. The information Sergeant Blunt gleaned during his interactions with defendant became the basis for two search warrants, one covering the home and one covering Defendant's vehicle.

Defendant now seeks to suppress all evidence obtained during the execution of those search warrants, including the estimated 355 marijuana plants seized from the basement of the home, on the grounds that the warrant is the fruit of an unreasonable seizure in violation of the Fourth Amendment.

Specifically, Defendant argues that the troopers seized him when they first approached him outside his home and that because they had no reasonable, individualized suspicion to do so, he was unreasonably seized in violation of the Fourth Amendment. Defendant also argues that, even if the encounter was not an unreasonable seizure, he did not grant the troopers consent to enter his home but merely submitted to the troopers' authority. Defendant further argues that the

---

operations take place in basements.

affidavit used to obtain the search warrant was misleading because it incorrectly implied that Defendant granted the troopers consent to enter his home.

After considering the record, the court finds (A) that the officers' initial contact with Defendant, up to the point at which they took and retained his identification, was consensual in nature and thus need not have been justified by reasonable suspicion of criminal activity; (B) that the seizure of Defendant, at the time when the troopers took and retained his identification, was justified by reasonable suspicion and was reasonably related in scope to the circumstances that justified the detention; and (C) despite being detained, Defendant voluntarily allowed the officers to accompany him to the backdoor of the home and then inside the home and thus consented to the officers' search.

## **ANALYSIS**

The parties noted in their written submissions that, because Blunt and his fellow Missouri State Troopers crossed the state line into Kansas and contacted Defendant while mistakenly believing they were still in Missouri, the troopers lacked authority to act as law-enforcement officers under Kansas law. This mistake, however, does not alter the familiar analysis a federal court must undertake in this situation: whether the actions of the troopers violated Defendant's Fourth

Amendment right to be free from unreasonable government searches and seizures.[5]

Courts have recognized three types of citizen-police encounters: (1) consensual encounters, which do not implicate the Fourth Amendment; (2) investigative detentions, which must be justified by reasonable, articulable and individualized suspicion, and (3) arrests. *See, e.g., United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009). What starts out as a consensual encounter may evolve into an investigative detention, and, of course, a detention may evolve into an arrest. *See id.* This court must analyze the encounter between Defendant and the troopers from its inception and to determine whether the requisite level of suspicion existed at each stage. *Id.* at 945.

   *A. Initial Contact*

---

[5] The fact that the officers were out of their authorized jurisdiction may be relevant for purposes of state law but does not change this court's analysis for purposes of suppression. "[I]t is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 128 S.Ct. 1598, 1607-08 (2008) (holding that a search of a person, conducted incident to an arrest that was beyond the arresting officers' authority under state law, nonetheless should be evaluated by Fourth Amendment standards for warrantless searches). *See also Bowling v. Rector*, 584 F.3d 956, 968 (10th Cir. 2009) (holding that Fourth-Amendment analysis was proper inquiry to evaluate validity of search warrant sought and executed by an officer who was investigating a matter outside the limited subject-matter jurisdiction granted to him by Oklahoma law); *United States v. Green*, 178 F.3d 1099, 1107 (10th Cir. 1999) (applying Fourth Amendment analysis to officers' execution of search warrant outside their state-authorized jurisdiction); *United States v. Gonzales*, 535 F.3d 1174, 1183 (10th Cir. 2008) (state jurisdictional law irrelevant to inquiry of reasonableness of traffic stop under Fourth Amendment); *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (stating that officer's authority under state law is irrelevant for purposes of analyzing validity of consent to search).

An encounter between a citizen and police that does not rise to the level of a seizure does not implicate the Fourth Amendment; although the Fourth Amendment "proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation" with law enforcement. *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)).

Thus, if police do not have an individualized basis for suspecting a citizen of wrongdoing, they may nonetheless approach the citizen, ask questions, ask for identification, and ask to search the person's property, so long as they "do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 434-35. The critical inquiry, for purposes of determining whether a seizure occurred, is whether a reasonable person, in view of all the circumstances, would have believed that he or she was free to leave or otherwise end the encounter. *See, e.g.*, *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002). The United States Supreme Court has instructed courts to apply this "reasonable person" standard from the viewpoint of an *innocent* person-- a recognition that someone who encounters police while concealing contraband is less likely than the hypothetical "reasonable person" to consider himself free to leave.[6] *Bostick,* 501 U.S. at 438.

---

[6] The officers' subjective intent for initiating the contact does not enter the analysis, nor does the citizen's subjective opinion of the officers' presence. *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996). For this reason, labeling such an encounter as truly "consensual" is somewhat of a misnomer, given that many citizens who encounter police in this fashion, particularly those who are concealing

Factors that might indicate that a purportedly consensual, routine, citizen-police encounter has crossed the line into a seizure include (i) the threatening presence of several officers, (ii) the display of a weapon by an officer, (iii) physical touching of the citizen by police, (iv) the use of language or a tone of voice by officers that sends the message that compliance is required, (v) prolonged retention of the citizen's personal effects, (vi) a request to accompany the officer to the police station, (vii) interaction in a small, enclosed, non-public place, and (viii) absence of other members of the public. *United States v. Rogers*, 556 F.3d 1130, 1137-38 (10th Cir. 2009). This list is non-exclusive, however, and no single factor is dispositive. *Id.* at 1138. Based on the totality of the circumstances, the court must determine whether "a reasonable person would have believed that he was not free to terminate" the encounter with police. *Id.*

In this case, the three troopers decided to initiate contact with Defendant as he exited his truck in his rear driveway because they suspected, reasonably or not, that he was illegally growing marijuana.[7] Of the three officers present, the one standing nearest to Defendant was unarmed and wearing plain clothes. Unquestionably, Mr.

---

contraband, would prefer that the meeting never occurred.

[7] The parties' written submissions debate whether reasonable suspicion, sufficient to justify an investigatory detention, existed at the time the troopers made contact with Defendant as he exited his truck. Because this court finds that the officers' initial contact with Defendant was not a seizure for Fourth Amendment purposes, it does not decide the issue of whether reasonable suspicion existed at any time prior to the troopers taking and retaining Defendant's identification.

Jones viewed their arrival in the alley as threatening, but three officers' presence is not, standing alone, enough to convert a consensual encounter into a seizure in a reasonable citizen's point of view. *Cf. United States v. Spence*, 397 F.3d 1280, 1284 (10th Cir. 2005) (three officers visiting suspect at home); *see generally United States v. Reeves,* 524 F.3d 1161, 1167-68 (10th Cir. 2008).

The troopers did not encircle Defendant. They parked their cars in the alley behind him but did not block the alley from the other direction.[8] Although Sergeant Blunt rested his arms on the bed of Defendant's truck, a gesture that arguably implies authority, the troopers did not prevent Defendant from getting back into his truck or prevent him from walking away.

Sergeant Blunt testified that he spoke in a "casual" and "low-key" fashion to Defendant. After Defendant said, "Oh, shit" and asked how the troopers knew he had marijuana plants, Blunt made a joke and, he testified, the men laughed. Defendant's counsel has argued that Blunt's statement was not a question and therefore that it sent the message that compliance was required. This fact-intensive analysis, however, does not hinge on whether an officer's words could be characterized as statements or questions. The court finds that Blunt's statement that he was "here to get" Defendant's marijuana plants did not send a message that Jones

---

[8] Even had Defendant's vehicle been blocked, Defendant was not restricted from leaving the area on foot. *Cf. United States v. Thompson*, 546 F.3d 1223, 1228-29 (10th Cir. 2008) (distinguishing contact with recent occupant of vehicle from

had no choice but to comply. Blunt's initial words to Defendant did not cause the encounter to become a seizure for Fourth Amendment purposes.

The officers did not inform Defendant that he was free to refuse their requests, but failure to do carries little weight in the overall analysis. *See United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008). There was no indication that the officers displayed weapons, touched Defendant at any time, or asked that Defendant accompany them to the police station. Additionally, the court notes that this exchange took place in a relatively open area that was not out of the public's view.

Based on the foregoing analysis, the court finds that, at the time of the initial conversation between Defendant and troopers, a reasonable person would not have felt that he or she was unable to terminate the encounter. Defendant therefore was not seized, for purposes of the Fourth Amendment, at the time of the initial conversation between Defendant and the troopers.

*B. Investigative Detention*

Defendant submits, and the Government concedes, that even if Defendant was not seized for Fourth-Amendment purposes at the outset of the encounter, he was seized as soon as the officers retained his identification for a records check. Assuming Defendant was detained, this court must determine whether such detention

---

traffic stop).

was reasonable at its inception and, if so, whether the resulting detention was reasonably related in scope to the circumstances that justified it.

To determine whether reasonable suspicion existed, the court must examine the totality of the circumstances from the viewpoint of an objectively reasonable officer and determine whether there was, in light of common sense, human experience, and officers' specialized training, a particularized and objective basis to suspect that the Defendant was engaged in criminal activity. *See United States v. Ramirez*, 479 F.3d 1229, 1244 (10th Cir. 2007).

Defendant argues that having a criminal record alone is not enough to create reasonable suspicion, nor is shopping at a business that sells legal items that could be put to illegal use. The court, however, must analyze whether reasonable suspicion existed *at the time the detention began*—in other words, when the troopers took and retained Defendant's identification. At that point in the encounter, Sergeant Blunt knew that Defendant was driving on a suspended license, had a prior drug conviction, had just exited a hydroponics store carrying a plastic sack, and had taken a circuitous route home. Sergeant Blunt also had observed Defendant's dejected reaction— bowing his head and stating, "Oh, Shit" -- when Blunt mentioned marijuana plants.[9] Blunt testified that he was knowledgeable about marijuana cultivation and hydroponics and had conducted more than 100 investigations that had led to finding

indoor marijuana-growing operations, and that his manner of introducing himself to Defendant was calculated to gauge Defendant's reaction.

Based on the totality of the circumstances, the court concludes that reasonable, articulable, individualized grounds for suspecting Defendant of criminal activity existed at the time the troopers asked for and retained Defendant's identification. The detention, thus, was lawful at its inception.

Even if a detention is justified at its inception, it may violate the Fourth Amendment if it expands in scope beyond what is reasonably related to the circumstances that justified the detention. *See United States v. Botero-Espina*, 71 F.3d 783, 786 (10th Cir. 1995). Defendant has not raised the argument that such an unwarranted expansion in scope occurred. Moreover, there are no facts indicating that the officers' actions while checking Defendant's identification exceed the scope of a reasonable detention. *Cf. United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (discussing reasonableness of delay for records check in context of traffic stop). Sergeant Blunt and Trooper Tyrrell's entry into the home apparently occurred within a few minutes of the retention of Defendant's identification, and Trooper Bell was still in his patrol car running the records check at the time the shooting occurred.

For these reasons, the court finds that defendant was not unreasonably detained as the troopers retained his identification.

---

[9] Blunt testified that after his initial statement, Defendant's "gestures indicated… that

*C. Troopers' entry into home*

The court already has determined that officers did not unreasonably seize Defendant because the initial encounter was consensual and because, at the time the encounter escalated to a seizure, reasonable suspicion existed. The remaining question is whether the Defendant validly consented to the troopers' approach to the back door of his home and their entry into his home, or whether, as Defendant argues, Defendant merely submitted to the troopers' claim of authority to enter the home.

A warrantless search of a residence does not violate the Fourth Amendment if voluntary consent has been given by a resident. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether consent was given voluntarily is a question of fact to be decided in light of the totality of the circumstances, and a person who has been detained may nonetheless validly consent to a search. *See, e.g., United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993). The government, however, bears the burden of showing that consent was voluntary. To do so, it "must proffer clear and positive testimony that consent was unequivocal and specific and freely given," and (2) "prove that this consent was given without implied or express duress or coercion." *United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007) (citations omitted).

---

I was accurate that there were marijuana plants at his residence."

Defendant primarily argues that the officers' initial statement that they were there to get Defendant's marijuana plants was a clear directive that caused Defendant to submit to a claim of lawful authority. The court disagrees with Defendant's assessment of the encounter.

Sergeant Blunt stated, immediately upon contacting Defendant, that he was there to get Defendant's marijuana plants, but, far from a demand to open the door of the home, the statement was made in a conversational manner and was followed by a joking exchange between Blunt and Defendant. Sergeant Blunt testified that he conveyed his desire to search Defendant's house but that "I never said I wasn't going to leave" until Defendant granted consent. An officer's stated suspicion, moreover, does not automatically render consent involuntary. *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) (citation omitted).

Defendant did not attempt to stop the officers from entering the home; to the contrary, he began walking toward the house with them following him and ultimately let them in. The officers did not explicitly tell defendant that he was not obligated to let them into the home, but neither did they claim that he *was* obligated to let them in. As the government notes, Defendant was free to maintain his denial of illegal activity, and he apparently was free to lead the officers where he chose in the house. His removal of his keys and his entry into the home ahead of the officers was an unequivocal gesture that showed his intent to let the officers into the home. These

actions, and his gesture indicating to the officers that there was nothing for them to see, all indicate that Defendant granted implied consent for the officers to enter the home.

Perhaps most tellingly, defendant was able to retrieve a gun from another room as he led the officers through the home. This shows the extent to which defendant was free to move about the home and to determine where he wanted to lead the officers, all of which suggests that he did not merely submit to the officers' authority. *Compare Reeves,* 524 F.3d 1161, 1167-68 (10th Cir. 2008) (citing examples of citizens' submission to officers' stated authority to enter their home).

Based on the foregoing, the government has met its burden of establishing that Defendant's consent to enter the home was given voluntarily.[10]

Because the court finds consent was given voluntarily, it has no need to reach Defendant's claim that the search-warrant affidavit contained misleading information.

---

[10] Alternatively, even if the government had failed to meet its burden of proving defendant's voluntary consent to entry of his home, the court notes that the officers had probable cause sufficient for the issuance of a search warrant when they smelled marijuana 10 feet from the back door of his home. Defendant has argued that this area, which was exposed to the alley and unfenced, was within the protected "curtilage" of the home. Based on the government's exhibits, however, any passer-by in the alley would have been able to approach knock on the home's back door. Defendant had taken no steps to shield this area from public view, it was not enclosed, and there were no indications that the area harbored the kinds of intimate activity associated with a home. As such, the officers' presence there, even while detaining defendant, would not violate the Fourth Amendment.

In summary, the initial encounter between Defendant and the troopers, up to the point at which the troopers retained Defendant's identification, did not implicate the Fourth Amendment and did not need to be justified by reasonable suspicion. The troopers did, however, have the requisite level of individualized, reasonable suspicion at the time they took Defendant's identification. Defendant's subsequent actions indicated unequivocally that he granted the officers consent to enter his home, and the consent was not coerced or granted under duress.

**IT IS THEREFORE ORDERED BY THE COURT THAT**

Defendant's Motion to Suppress (Doc. 12) is **denied**.

IT IS SO ORDERED.

Dated this 15th day of June, 2010, in Kansas City, Kansas.

                                                s/ John W. Lungstrum
                                                John W. Lungstrum
                                                United States District Judge